UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER L. BUCKNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:13-CV-2439-NAB |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of Commissioner's final decision denying Christopher L. Buckner's ("Buckner") application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Buckner alleges disability due to learning disability and asthma. (Tr. 268.) The parties consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). [Doc. 9.] Based on the following, the Court will affirm the Commissioner's decision.

**I. Background**

Buckner received SSI benefits as a child, beginning on May 21, 1996. (Tr. 54.) In accordance with social security regulations, Buckner's eligibility was re-determined under the social security rules for new adult claimants. 20 C.F.R. § 416.987. On July 30, 2010, the Social Security Administration ("SSA") determined Buckner was no longer disabled as of that date and ceased his SSI benefits. (Tr. 60-64.) Buckner filed an appeal before a hearing officer and a hearing was held on October 26, 2010. (Tr. 78.) Bucker's appeal was denied. (Tr. 78-89.) The SSA granted Buckner's timely request for a hearing before an administrative law judge.

("ALJ"). (Tr. 90-96.) An administrative hearing was held on May 22, 2012. (Tr. 33-53.) Buckner and Vocational Expert ("VE") Dale Thomas testified at the hearing. *Id.* The ALJ issued a written decision affirming the denial of benefits on July 26, 2012. (Tr. 11-26.) Buckner requested a review of the ALJ's decision from the Appeals Council. (Tr. 5.) On October 10, 2013, the Appeals Council denied Buckner's request for review. (Tr. 1-3.) The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

Buckner filed this appeal on December 4, 2013. [Doc. 1.] The Commissioner filed an Answer and Administrative Transcript on February 13, 2014. [Docs. 14, 15.] Buckner filed a Brief in Support of his Complaint on April 21, 2014. [Doc. 20.] The Commissioner filed a Brief in Support of the Answer on July 11, 2014. [Doc. 25.]

## II.     Standard of Review

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1)(A).

The SSA uses a five-step evaluation process to determine whether a person is disabled. 20 C.F.R. § 416.920(a)(1). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004). First, the claimant must not be engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). Second, the claimant must establish that he or she has an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities and meets the durational requirement of a continuous

period of disability for 12 months. 20 C.F.R. § 416.920(a)(ii). Third, the SSA determines whether the claimant's impairment meets or equals an impairment listed in the appendix to the applicable regulations. 20 C.F.R. § 416.920(a)(iii). Fourth, the claimant must establish that the impairment prevents him or her from doing past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity to perform a significant number of jobs in the national economy. *Singh v. Apfel*, F.3d 448, 451 (8th Cir. 2000). If the claimant satisfies all of the criteria under the five-step evaluation, the ALJ will find the claimant to be disabled. 20 C.F.R. § 416.920(a)(4)(v).

This court reviews decisions of the ALJ to determine whether the decision is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision. *Smith v. Shalala,* 31 F.3d 715, 717 (8th Cir. 1994). Therefore, even if this Court finds that there is a preponderance of evidence against the weight of the ALJ's decision, this Court will affirm the decision if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. *Gwathney v. Chater*, 1043, 1045 (8th Cir. 1997).

To determine whether the ALJ's final deccision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

> (1) The findings of credibility made by the ALJ;
>
> (2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physician;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare,* 623 F.2d 523, 527 (8th Cir. 1980).

### III. ALJ's Decision

The ALJ determined that Buckner met the insured status requirements of the Social Security Act through the month preceding the month in which he attained age 18. (Tr. 13.) The ALJ found that Buckner has the following severe impairments: psychotic disorder not otherwise specified, alternately diagnosed as schizophrenia, attention-deficit/hyperactivity disorder ("ADHD"), and a learning disorder. (Tr. 13.) The ALJ found that Buckner does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16.) The ALJ determined that Buckner has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, with the following nonexertional limitations: that he can understand, remember, and carry out simple instructions in a low-stress environment; and can occasionally interact with supervisors, coworkers, and the general public. (Tr. 18.) The ALJ found that Buckner has no past relevant work and there are a significant number of jobs in the national economy that Buckner could perform. (Tr. 24-25.) Finally, the ALJ concluded that

Buckner's disability ended on July 30, 2010, and Buckner has not become disabled again since that date. (Tr. 25.)

IV. **Administrative Record**

The following is a summary of relevant evidence before the ALJ:

A. **Hearing Testimony**

The ALJ heard testimony from Buckner and Dale Thomas, the vocational expert ("VE"). Buckner was represented by counsel. (Tr. 33-53.)

1. **Buckner's Testimony**

Buckner testified that he was 20 years old at the time of the hearing. (Tr. 36-37.) Buckner completed high school and had been enrolled in special education and regular classes during school. (Tr. 38.) He received mostly C's in school. (Tr. 39.) Buckner stated that he had only attempted to work once at KFC. (Tr. 39.) His job at KFC did not last past the initial orientation period because he "didn't know what was going on" and his supervisor said that Buckner did not have the skills to work at KFC. *Id.*

Buckner testified that he attended Meramec Community College[1] for a period of time, but he was suspended due to his involvement in a physical altercation that resulted from bullying. (Tr. 40.) Subsequently, the school overturned the suspension on the condition Bucker attend anger management classes. (Tr. 40.) Bucker decided not to return to Meramec and had applied to another college. (Tr. 40.) During his time at Meramec, Buckner enrolled in the same math course and communications course twice to pass and improve his grade. (Tr. 44.) He received an average grade in American politics and he "did okay" in art, writing, and reading classes. *Id.* At Meramec, Buckner received special accommodations, including extra time to take tests, use of note takers, and video recordings of the lectures. (Tr. 47.)

---

[1] Meramec is misspelled in the transcript as "Merricmack." (Tr. 40, 45.)

5

Buckner testified that he has a tic disorder and voices that run through his head. (Tr. 39.) He takes Trazadone to sleep at night. (Tr. 39.) He sees a doctor and a counselor for his problems. (Tr. 41.) Buckner stated that he takes Risperdal for the voices and tics. (Tr. 42.) Buckner testified he had been hospitalized once before for asthma, but he was unsure about the date of the hospitalization. *Id*. Buckner stated that he suffers from different thoughts in his head that cause him to lose focus and interest quickly. *Id*. The voices distract him about fifty percent of the time. (Tr. 48.)

Buckner lives with his mother and his 18 year old sister. (Tr. 43.) When attending classes, Buckner took the bus to and from school on some occasions but he preferred to have his sister drive him so that he would not have to sit on the bus with all of the other people. (Tr. 44-45.) He has a license, but he does not drive. (Tr. 45.) Buckner testified that he had friends at Meramec and that he still sees them. *Id*. Buckner also testified that he keeps in touch with some friends from his neighborhood and high school. (Tr. 46.) He likes to spend time at the mall with them, but he cannot focus on movies long enough to enjoy watching them. *Id*. He also plays video games and plays basketball. (Tr. 47.) Buckner stated that he helps his mother clean and sometimes he cooks for himself. (Tr. 46.) His mother arranges transportation for him when he has a doctor's appointment. *Id*. He knows how to use a computer. (Tr. 47.)

### 2. VE Dale Thomas

VE Dale Thomas testified that individuals with learning disabilities, an average IQ, and attention deficit disorder may not be able to carry out even simple instructions necessary to perform unskilled work and may not be able to relate well to co-workers as a result. (Tr. 49.) He also stated that attention deficit disorder may prevent a person from being able to concentrate and focus for at least two hours, which would be the time needed to do unskilled work. (Tr. 49-

6

50.) He testified that if Buckner had no exertional limitations, but with the learning disability and the attention deficit problems, could follow simple instructions in a low stress environment without a lot of social interaction, limited social interaction, more so with coworkers than supervisors and there was not a lot of public contact, there would be work that he could do. (Tr. 50). The VE identified several unskilled, light exertional jobs that Bucker could perform with the aforementioned limitations: (1) bench assembler, (2) maid and housecleaner, such as laundry worker, and (3) packer and hand packager. (Tr. 51.) He testified that if Bucker had problems doing the aforementioned jobs, without some support in terms of close supervision, all jobs at the unskilled level would be precluded. (Tr. 52.)

**B. Record**

**1. Education Records**

Buckner originally applied for SSI on May 21, 1996, and his application to the program was granted, because he met the severity of Section 112.05 C of the Listing of Impairments, Part B of Appendix 1, Subpart P, Regulations No. 4, for mental retardation with a full scale IQ of 59. (Tr. 457-460.) On September 26, 2005, his disability status was continued. *Id.*

In the spring of 2005, Buckner's school conducted an Individualized Education Plan[2] (I.E.P.)/Re-evaluation meeting regarding his educational needs. (Tr. 374-381.) At that time, Buckner was given the Stanford Binet V Abbreviated Battery test[3]. (Tr. 378.) His test results showed cognitive ability within the upper limits of borderline range of performance. *Id.* In the verbal domain, he demonstrated low average ability to define words. *Id.* Assessment of his

---

[2] "An IEP consists of a detailed written statement arrived at by a multi-disciplinary team specifying the services, including specially designed instruction, that a child will receive." *Aumann v. Wentzville R-IV School Dist.*, No. 4:13-CV-867 CEJ, 2014 WL 1648742 at *2 (E.D. Mo. Apr. 23, 2014)
[3] The Stanford Binet V test is a "test used to measure intelligence, mostly in children. The tests use verbal and performance activities of graded difficulty." 5 J.E. SCHMIDT, M.D., ATTORNEY'S DICTIONARY OF MEDICINE ILLUSTRATED PR-TG (2014).

7

academic skills indicated overall performance within the low average range of function for his grade placement. *Id.* Results of the language evaluation indicated functioning with the borderline to low average range. (Tr. 379.) He qualified for special education services due to chronic elevated lead levels. (Tr. 379.) It was determined that he would continue to benefit from presentation of directions in a combined oral/visual manner, extended time limits to complete oral and written tasks, and use of repetition and rephrasing. (Tr. 379.)

Buckner's IEP/Re-evaluation was completed on February 8, 2010 during Buckner's senior year in high school. (Tr. 369-373.) Buckner's disability affected his participation in the general education setting in the following ways: completing assignments and tests in a timely manner and comprehending directions presented both written and auditorally, writing assignments and generalizing learned information. (Tr. 370.) It was determined that his disability will affect his ability to reach his post-secondary goal of attending a 2 year community or tech school in the following ways: being able to complete college applications independently, maintaining appropriate grade point average for the program as the courses become more challenging, and staying organized for classes in order to complete assignments in a timely manner. (Tr. 370.) His disability would affect his post-secondary goal of living in an apartment or independently in the following ways: budgeting money and organizing needs for everyday life. (Tr. 370.) He demonstrated poor auditory discrimination, poor auditory memory for material read or heard, and very poor comprehension. (Tr. 371.) He did not demonstrate understanding for higher level thinking and reading skills. (Tr. 371.) He had great difficulty with reading comprehension due to weak memory and writing skills. (Tr. 371.) His thinking skills were also weak as a result of poor memory and generalization skills. (Tr. 371.) His cognitive ability is within the low average range. (Tr. 371.)

On April 2, 2010, two of Buckner's teachers completed questionnaires regarding him. (Tr. 294-301, 319-326.) Veterinary Assistant Instructor Donna Hobles-Powell indicated in her questionnaire that Bucker had problems acquiring and using information and attending and completing tasks. (Tr. 295-296.) Specifically, she noted he had serious problems comprehending and doing math problems and expressing ideas in written form. (Tr. 295.) Hobles-Powell wrote, "Christopher really struggles with math and reading comprehension. He doesn't always understand the meaning of what he is reading." (Tr. 300.) Academic Lab (Study Hall) Teacher Jennifer Boston-Manning indicated that Bucker had difficulties acquiring and using information, including obvious problems of reading and comprehending written material and expressing ideas in a written form. (Tr. 320.) She also noted that he had problems attending and completing tasks, including organizing his own things or school materials. (Tr. 321.)

In a letter dated October 31, 2011, the Manager of Records at St. Louis Community College stated that Bucker had been enrolled at its Meramec campus since Fall 2010. (Tr. 420.) He was currently in good academic standing and his major was general transfer studies, an associate's degree for students who intend to transfer to a 4 year college or university. (Tr. 420.) A transcript from St. Louis Community College dated October 31, 2011 showed that he had a cumulative grade point average of 2.6. (Tr. 421.) The college also indicated that Buckner's academic accommodations included (1) testing out of class, (2) testing with extended time, (3) volunteer note taker, (4) preferential seating, and (5) ability to tape lectures as a form of note taking. (Tr. 423.)

2. **Medical Records**

   a. **BJC Healthcare**

A medical/psychiatric assessment was completed on March 18, 2009. (Tr. 507-510.) In the assessment, Dr. Cynthia Rodgers, a psychiatrist, determined that Bucker had Tourette's syndrome, ADHD, and obsessive compulsive disorder. (Tr. 510.) She opined that his global assessment functioning[4] ("GAF") score was 65. (Tr. 510.) A GAF score of 65 indicates mild symptoms or some difficulty in social, occupational, or school functioning. DSM-IV-TR at 34. She prescribed Tenex to address his tics, impulsivity, and hyperactivity. (Tr. 509.)

On February 8, 2010, Buckner received Risperdal to address his tics. (Tr. 505-506.) On March 2, 2010, Buckner reported a good response to Risperdal and that he had less frequent and less urgent tics. (Tr. 503.) The medical doctor noted that Bucker reported that his school performance was good and no behavioral problems were noted by Bucker or his mother. (Tr. 503.)

   b. **Hopewell Center**

Bucker began psychiatric care at Hopewell Center in October 2010. Dr. Erickson Smith, a psychologist and licensed clinical social worker completed an intake assessment of Buckner on October 18, 2010. (Tr. 610-614.) Buckner reported hearing voices. (Tr. 613.) Dr. Smith observed that Buckner was oriented to person, time, and place. (Tr. 614.) He noted that Buckner's affect was appropriate and his mood was stable. (Tr. 614.) He opined that Bucker's GAF score was 45. (Tr. 614.) A GAF score of 45 indicates serious symptoms or any serious

---

[4] Global Assessment Functioning score is a "clinician's judgment of the individual's overall level of functioning." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Rev. 2000) ("DSM-IV-TR").

impairment in social, occupational, or school functioning. DSM-IV-TR at 34. He diagnosed Buckner with chronic motor tics, ADHD, and schizophrenia undifferentiated type. (Tr. 614.)

Dr. Roy Wilson, a psychiatrist, performed a psychiatric evaluation of Buckner on November 2, 2010. (Tr. 615-620.) Buckner reported that classes were stressing him out, he was doing poorly, he was easily distracted, and zoned out in classes. (Tr. 615.) Dr. Wilson observed no appearance of hyperactivity, except fidgeting, and rocking in a chair. (Tr. 616.) Buckner reported several hyperactive behaviors. (Tr. 616.) Buckner also reported episodes of shortness of breath lasting no longer than two minutes. (Tr. 616.) Dr. Wilson observed a few tics and mild fidgetiness, an appropriate affect, euthymic mood, and excessive speech. (Tr. 618-619.) He estimated that Bucker was of average intelligence. (Tr. 619.) He assessed Buckner's GAF at 60, indicating moderate symptoms or moderate impairment in social, occupational, or school functioning. (Tr. 620.) Buckner continued to receive treatment from Dr. Smith and Dr. Wilson through February 2012. (Tr. 594-609, 684-686.) During this time period his mental status examinations were substantially normal. (Tr. 594-609, 684-686.) Buckner reported some auditory hallucinations in 2010, between January 2011 and June 2011 and again in December 2011. (Tr. 600, 603-606, 608-609, 686.)

On March 22, 2011, Dr. Smith and Dr. Wilson completed a Mental Residual Functional Capacity Questionnaire regarding Buckner. (Tr. 583-587.) The doctors diagnosed Buckner with Tourette Syndrome and psychotic disorder not otherwise specified, and learning disorder. (Tr. 583.) They noted that Buckner reported hearing voices and having uncontrolled movement in his neck. (Tr. 583.) They indicated in a checklist that Buckner exhibiting the following symptoms: impairment in impulse control, mood disturbance, difficulty thinking or concentrating, psychomotor agitation or retardation, paranoid thinking or inappropriate

suspiciousness, recurrent obsessions or compulsions which are a source of marked distress, bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes, intense and unstable personal relationships and impulsive and damaging behavior, emotional stability, manic syndrome, decreased need for sleep, and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension. (Tr. 584.)

The doctors opined that Buckner was unable to meet competitive standards for semiskilled and skilled work. (Tr. 586.) They also stated that Buckner was unable to meet competitive standards regarding interacting appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and travel in unfamiliar places. (Tr. 586.) They found that he was seriously limited but not precluded from understanding and remembering very short and simple instructions, make simple work-related decisions, ask simple questions or ask assistance, and use public transportation. (Tr. 585-586.) They further opined that he was unable to meet competitive standards to remember work-like procedures, carry out very short and simple instructions, maintain attention for two hour segments, sustain an ordinary routine without special supervision, completed a normal work day and work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and be aware of normal hazards and take appropriate precautions. (Tr. 585.) Finally, they opined that he had no useful ability to function regarding maintaining regular attendance and being punctual within customary usually strict tolerances, getting along with co-workers or peers without unduly distracting them or

exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, and dealing with normal work stress. (Tr. 585.)

c. **Consultative Examiner Lloyd Irwin Moore, Ph.D.**

On July 16, 2010, Dr. Lloyd Irwin Moore attempted to perform a WAIS-IV[5] test for psychometric evaluation. (Tr. 537-540.) Dr. Moore wrote that Buckner was very uncooperative during the examination. (Tr. 537.) Dr. Moore wrote that Buckner exhibited a very sarcastic tone and stated that the activities were for kindergartners and stupid. (Tr. 537.) Dr. Moore eventually ended the testing due to Buckner's behavior. (Tr. 538.) No mental status examination was completed, but Dr. Moore observed that Buckner was alert, oriented, and very argumentative. (Tr. 538.) Dr. Moore opined that based on his observations of Bucker and his medical history, Buckner's diagnosis included Tourette disorder, ADHD, obsessive compulsive disorder, and oppositional defiant behavior. (Tr. 539.) He opined, based on observation alone, that Buckner had moderate impairment in activities of daily living, social functioning, and concentration, persistence, and pace. (Tr. 539.) He assessed Buckner's current GAF score as 60.

d. **Consultative Examiner Martin Isenberg, Ph.D.**

Dr. Isenberg reviewed Buckner's medical records and completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment on September 17, 2010. (Tr. 567-581.) Dr. Isenberg diagnosed Buckner with a history of ADHD, learning disorder, and tic disorder. (Tr. 568.) He opined that Buckner had mild limitations in activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence, and pace. (Tr. 575.) Specifically, he found Buckner moderately limited in the ability to understand,

---

[5] The WAIS "is an intelligence scale based on verbal and performance material which takes into consideration the age of the subject. The tests are administered individually and consist of eleven subtests applicable to adults and adolescents." Attorney's Dictionary of Medicine and Word Finder, W-16, Volume 6, J.E. Schmidt, M.D. (2014).

13

remember, and carry out detailed instructions; interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors. (Tr. 579-580.)

## V. Discussion

Buckner alleges two errors on review. First, Buckner asserts that the ALJ failed to rely on "some" medical evidence in the RFC determination. Second, Buckner asserts that the question given to the VE did not capture the concrete consequences of Buckner's impairment and therefore the response of the VE did not represent substantial evidence upon which the ALJ could rely.

### A. Residual Functional Capacity

The RFC is defined as what the claimant can do despite his or her limitations, and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 416.945(a). The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis.[6] SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his limitations. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). RFC is a medical question. *Eichelberger*, 390 F.3d at 591. An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). In making a disability determination, the ALJ shall "always consider the medical opinions in the case record together with the rest of the relevant evidence in the record." 20 C.F.R. § 416.927(b); *see also Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir.

---

[6] A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. SSR 96-8p, 1996 WL 374184, at *1.

2009). "A disability claimant has the burden to establish her RFC." *Eichelberger*, 390 F.3d at 591 (citing *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004)).

First, Buckner contends that the ALJ fails to cite to any medical evidence to support his conclusions regarding Buckner's RFC. Plaintiff contends that the ALJ cannot rely on the opinion of Dr. Eisenberg to support the RFC determination, because he was only a one-time consulting physician. The ALJ gave significant weight to Dr. Eisenberg's opinion. (Tr. 19.) The ALJ found that Dr. Eisenberg's opinion was consistent with the objective medical evidence regarding Buckner's impairments. (Tr. 19.)

The Court finds that Buckner's argument lacks merit, because the ALJ's RFC determination is supported by some medical evidence on the record as a whole. The Court agrees that "the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision." *Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir. 2003). As an initial matter, however, the ALJ did not solely rely upon the opinion of Dr. Eisenberg to support the RFC determination. As stated by the ALJ, Dr. Eisenberg's opinion is supported by other evidence in the administrative record. The treatment notes of Dr. Wilson and Dr. Smith support the limitations contained in the RFC determination and are consistent with Dr. Eisenberg's opinion. Buckner's educational records from high school and community college are also consistent with the limitations contained in the RFC determination. Although Buckner has required accommodations in the educational setting, he has maintained a good grade point average and is in good academic standing. The record shows that his medication adjustments have helped reduce his tics and auditory hallucinations. This is not a case where the consultative examiner's opinion is the only thing in the record supporting the RFC determination made by the ALJ. *See Parker v. Colvin*, No. 4:13-CV-1926 TIA, 2015 WL 417585 (E.D. Mo. Feb. 2, 2015).

The larger medical record supports Dr. Eisenberg's opinion and the ALJ could give it significant weight in evaluating Buckner's RFC.

Second, Buckner contends that the ALJ should have given significant consideration to the opinion of his treating physicians, Dr. Smith and Dr. Wilson. The ALJ gave little weight to the doctors' Mental RFC Assessment regarding Buckner. (Tr. 20.) The ALJ stated that the extreme limitations contained in the doctors' opinions were unsupported by their treatment notes. (Tr. 20.) Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007). A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 416.927(c)(2); SSR 96-2p; *see also Hacker*, 459 F.3d at 937. "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." *Prosch v. Apfel,* 201 F.3d 1010, 1013 (8th Cir. 2000). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if [the conclusions] are inconsistent with the record as a whole." *Id.*

After review of entire administrative record, the Court finds that the ALJ did not err in giving little weight to the doctors' Mental RFC Assessment. The doctors' opinion was directly contradicted by their treatment notes in several areas. For example, the doctors stated that he

was seriously limited in, but not precluded from using public transportation. (Tr. 586.) Buckner testified that he took the bus to school unless his sister drove him or his mom arranged transportation. (Tr. 44-45.) The doctors opined that Buckner would be unable to meet competitive standards in adhering to basic standards of neatness and cleanliness. (Tr. 586.) Their treatment notes indicate that Bucker's grooming was good, fair, age-appropriate, or he was well-groomed. (Tr. 594-596, 598, 600-602, 604-606, 684, 686.) The opinion also indicated that he had bi-polar symptoms with manic and depressive syndromes. (Tr. 584.) There is no evidence of any bi-polar symptoms in the medical records, including their own treatment notes. (Tr. 584.) The opinion also indicated that he had recurrent severe panic attacks, which is also not supported by the record. Buckner's treatment notes with the doctors indicated that he was frequently stressed about his classes, but he was ultimately successful overall. The doctors' opinion was contradicted by their own treatment notes and other evidence in the record. Buckner's activities of daily living also contradicted the substantial and severe limitations contained in the doctors' opinion. Therefore, the ALJ did not err in giving little weight to their opinion expressed in the Mental RFC Assessment.

Third, Buckner contends that there is no substantial evidence that his IQ score has improved and there is evidence to demonstrate it remains at 59[7]. Therefore, the effects of mild mental retardation or borderline IQ should have been considered in forming the RFC. The Court finds that Buckner's argument lacks merit. First, social security regulations require that IQ test results be sufficiently current. *See* 20 C.F.R. Pt. 404, Subpt., App. 1 § 112.00(D)(10). IQ test results obtained between the ages of 7 and 16 should be considered current for 4 years when the tested IQ is less than 40 and for 2 years when the IQ is 40 or above. *Id.* IQ test results obtained

---

[7] An IQ score of 59 would render a claimant disabled under social security regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05B (a claimant is disabled when he has a valid verbal, performance, or full scale IQ of 59 or less).

before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above. *Id.* In this case, Buckner's IQ test results were obtained at age 4 (Tr. 458.) and age 13 (Tr. 376.) Therefore, these tests are well beyond the date to be considered an accurate assessment of Buckner's current IQ level. Second, Buckner refused to complete an IQ assessment during the evaluation by Dr. Moore. (Tr. 537-540.) Dr. Moore estimated based on the partial testing that Buckner was within the mild mental retardation range of intellectual classification, but noted that the records provided to him were incongruent with that assessment. (Tr. 539.) Dr. Moore also opined that Buckner should have produced higher scores on the completed portions given the records available and the scores were probably somewhat lower than his ability, but not significantly lower. (Tr. 538.) Third, Buckner's successful matriculation into community college obtaining a 2.6 grade point average and his activities of daily living do not support his claims that his mental limitations exceed those contained in the RFC assessment. An ALJ may disregard test scores that are inconsistent with an applicant's demonstrated activities and abilities as reflected in the records as a whole. *Channell v. Colvin*, 756 F.3d 606, 608 (8th Cir. 2014) (claimant's daily activities did not indicate she was completely unable to work, she had no exertional limitations, and could perform unskilled work); *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (IQ score of 69 at age 16 was contradicted by claimant graduating in top half of class, taking regular classes, and receiving A's and B's); *Clay v. Barnhart*, 417 F.3d 922, 929 (8th Cir. 2005) (claimant's demonstrated abilities were inconsistent with those expected from a person with an IQ below seventy). The ALJ took into account the mental impairments contained in the record that were supported by substantial evidence, therefore, the ALJ did not err in assessing Buckner's RFC.

### B. Vocational Expert Testimony

"Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question." *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). "[T]he ALJ's hypothetical question must include the impairments that the ALJ finds are substantially supported by the record as a whole." *Id.* "However, the hypothetical need only include those impairments which the ALJ accepts as true." *Grissom v. Barnhart*, 416 F.3d 834, 836 (8th Cir. 2005). A "hypothetical question posed to a vocational expert must capture the concrete consequences of claimant's deficiencies." *Pickney*, 96 F.3d at 297. The Court has already determined that the RFC determination was supported by substantial evidence. Because the ALJ needed only to include those limitations that were supported by substantial evidence in the hypothetical, the VE's testimony's constituted substantial evidence.

## VI. Conclusion

For reasons set forth above, the Court affirms the Commissioner's final decision.

Accordingly,

**IT IS HEREBY ORDERED** that the relief requested in Plaintiff's Complaint and Brief in Support of Complaint is **DENIED**. [Docs. 1, 20.]

**IT IS FURTHER ORDERED** that the Court will enter a judgment in favor of the Commissioner affirming the decision of the administrative law judge.

Dated this 13th day of February, 2015.

        /s/ Nannette A. Baker
      NANNETTE A. BAKER
      UNITED STATES MAGISTRATE JUDGE